ERIC D. CHAN (State Bar No. 253082)
RAWAN N. KHALILI (State Bar No. 354076)
**ATHENE LAW, LLP**
10866 Washington Blvd., #142
Culver City, CA 90232-3610
Telephone: (310) 913-4013
E-mail: eric@athenelaw.com
rawan@athenelaw.com

Attorneys for Plaintiff POMONA VALLEY HOSPITAL MEDICAL CENTER

# IN THE UNITED STATES DISTRICT COURT FOR THE

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| POMONA VALLEY HOSPITAL MEDICAL CENTER,<br><br>　　　　Plaintiff,<br><br>　　vs,<br><br>DIRTY HANDS, LLC, DIRTY HANDS, LLC HEALTH BENEFITS PLAN, and DOES 1-20, inclusive;<br><br>　　　　Defendants. | Case No.:　2:26-cv-00447<br><br>**COMPLAINT FOR:**<br><br>**(1) BENEFITS UNDER SECTION 502(a)(1)(B) OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT (ERISA)**<br><br>**(2) THE NO SURPRISES ACT, 42 U.S.C. § 300gg-111(a), VIA ERISA SECTION 502(a)(1)(B)** |

Plaintiff, the Pomona Valley Hospital Medical Center, ("Plaintiff," "PVHMC" or "the Hospital") complains and alleges:

## THE PARTIES

1.      Claimant PVHMC is a nonprofit public benefit corporation duly organized and existing under the laws of the State of California.  Pomona Hospital was established in 1903 by local citizens in Pomona, California after a train derailment killed more than 30 passengers.  Following 117 years of careful and determined growth, PVHMC today is a 427-bed multispecialty regional medical center with more than 700 physicians and thousands of other medical professionals serving Pomona and the surrounding eastern Los Angeles and San Bernardino County areas.  It is one of the largest not-for-profit hospitals in the greater Los Angeles area, with four Centers of Excellence: a cancer care center; a heart and vascular center; a women's center; and a Level II Trauma Center, which provides comprehensive lifesaving treatment to victims of severe traumatic injuries.

2.      On information and belief, Defendant Dirty Hands, LLC is a Connecticut limited liability company with a principal place of business in Milford, Connecticut.  Based on records filed with the California Secretary of State on July 18, 2025, Defendant's members include William C. Ahearn, the Managing Member, who is a citizen of New Hampshire; Rory M. Ahearn, a citizen of Connecticut; Kathryn Tarsi and Michael Tarsi, citizens of Maine; and Michael Ahearn, a citizen of Colorado. According to Defendant Dirty Hands, LLC's website, Defendant is in the business of sales and merchandising for natural and organic products. Defendant's website boasts that it "Connect[s] Brands to Shelf in Over 5,000 Stores Nationwide," including, but not limited to, major grocery retailers such as Whole Foods, Sprouts, Erewhon, and Bristol Farms.  Plaintiff is informed and believes that Defendant Dirty Hands, LLC specifically directs its business activities to such retailers in the greater Los Angeles market.

/ / /

2

COMPLAINT

3. On information and belief, Defendant Dirty Hands, LLC Health Benefits Plan (the "Plan") is a self-funded health benefits plan governed by the Employment Retirement Income Security Act of 1974 (ERISA). The Plan is a proper defendant pursuant to ERISA section 502(d), 29 U.S.C. § 1132(d). According to the January 1, 2020, Plan Document and Summary Plan Description ("Plan / SPD") for the Plan, which is attached as **Exhibit A** hereto, Defendant Dirty Hands, LLC is the sponsor of the Plan (e.g., it funds Plan benefits) and is also the Plan Administrator as that term is understood under ERISA. The Plan / SPD further identifies Defendant Dirty Hands, LLC as the "Named Fiduciary" for the Plan. Plaintiff is informed and believes that the Plan covers employees of Defendant Dirty Hands, LLC and their family members in the greater Los Angeles region.

4. The true names and capacities of the defendants sued herein as DOES are unknown to Hospital at this time, and Hospital therefore sues such defendants by such fictitious names. Hospital is informed and believe that the DOES are those individuals, corporations and/or businesses or other entities that are also in some fashion legally responsible for the actions, events and circumstances complained of herein, were the agents, representatives, or employees of the other defendants, and may be financially responsible to Hospital for the services it has provided to the Patient. The Complaint will be amended to allege the DOES' true names and capacities when they have been ascertained.

5. Together, Dirty Hands LLC, Dirty Hands LLC Health Benefits Plan, and DOES 1-20 are referred to herein as "Defendants."

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because the action arises under the laws of the United States; and pursuant to 29 U.S.C. § 1132(e)(1), because the action seeks to enforce rights under ERISA.

/ / /

7. The United States District Court for the Central District of California is the appropriate venue for the filing of this case because a substantial part of the events or omissions that give rise to PVHMC's claims occurred in this judicial district. *See* 29 U.S.C.§ 1391(b)(2).

## FACTUAL ALLEGATIONS

8. Plaintiff PVHMC brings this lawsuit to recover approximately $1,342,718.90 in benefits due and owing to it under the terms of the Plan for life-saving medical services that it provided to a beneficiary of the Plan (referred to herein as the "Patient"), plus interest and attorneys' fees.[1]

9. For the reasons explained herein, the so-called "Seatbelt Exclusion" buried within the Plan – the only reason ever given by Defendants for their complete denial of payment – is unenforceable as a matter of law because it was inadequately disclosed, in violation of ERISA requirements.  (*See* Count One.)

10. Moreover, by its own terms, the Plan <u>must</u> pay for emergency services pursuant to the federal No Surprises Act (NSA), which requires that emergency services be covered without regard to any other term or condition of the Plan's coverage.  This emergency coverage mandate overrides the Seatbelt Exclusion as to all emergency services provided to the Patient before the stabilization of the Patient's emergency medical condition, as defined under the Emergency Medical Treatment And Labor Act (EMTALA).  (*See* Count Two.)

**A.      Plaintiff Saved the Patient's Life Following a Serious Car Crash and Provided Months of Care, But Defendants Refuse to Pay a Single Cent**

11. On February 26, 2024, the Patient suffered severe injuries after being ejected from a vehicle in a car crash.  The Patient was brought via ambulance to the Level II Trauma Center at PVHMC and received extensive care.

/ / /

---

[1] The Patient's name and identity are not used in order to protect protected health information (PHI) associated with the medical treatment of the Patient at PVHMC.

COMPLAINT

12. The Patient remained at PVHMC for approximately 68 days and was discharged on or around May 4, 2024.

13. The Plan approved the Patient's entire inpatient stay.

14. Thereafter, PVHMC submitted a reimbursement claim for the services rendered to the Patient. The total hospital charges for the Patient's care were $3,823,029.29. The Plan was contracted to use Cigna Healthcare's provider network, which includes PVHMC. Accordingly, the claim was adjudicated pursuant to PVHMC's managed care agreement with Cigna, and the amount due and owing to PVHMC for this lengthy hospital stay should have been $1,339,217.66. This amount was calculated pursuant to PVHMC's managed care agreement with Cigna based on the billed charges for the first eleven days of the Patient's stay at approximately 59.5% of the Hospital's billed charges, and for the subsequent days, at the PVHMC-Cigna Per Diem Rate of $9,201.00 per day.

15. Shockingly, however, PVHMC received an "Explanation of Benefits" (EOB) form issued by the Plan's claims administrator, 90 Degree Benefits, dated July 19, 2024, that informed the Hospital that nothing would be paid.

16. The EOB applied the "Cigna Healthcare discount," which is the contractual arrangement described above, and determined that the "Plan Allowed" amount would be $1,339,217.66. This is the amount that the Plan *should have paid* to the Hospital. But the Plan itself did not pay a single cent. Instead, the EOB assigned the entire $1,339,217.66 to "Patient Responsibility."

17. ERISA requires that the administrators of a group health plan such as the Plan give "[t]he specific reason or reasons for" a denial of benefits. 29 C.F.R. § 2560.503-1(g)(1)(i). Nothing on the EOB, however, explained why the Plan would not pay for these lifesaving services. The entire reason that individuals purchase health insurance is so that they have coverage in the event of a catastrophic accident such as the one suffered by the Patient. By failing to pay anything at all, Defendants' actions undermine the entire reason for having health insurance.

COMPLAINT

18.    Nor did the EOB explain why Defendants decided that the Patient should have to pay over $1.3 million for their own medical care, even though the Patient supposedly had full health care coverage under the Plan.

19.    The only explanation was a section of the EOB titled, "Remark Codes," which stated, cryptically, that "THESE SERVICES ARE NOT COVERED UNDER YOUR PLAN."

**B. Defendants Also Refuse to Pay for Follow-Up Care**

20.    On May 9, 2024, five days after the Patient was discharged, the Patient was brought *again* via ambulance to the emergency room and provided an emergency screening and other related care.

21.    PVHMC submitted a claim for this subequent emergency room visit, for which it expected to be paid $3,450, which was PVHMC's outpatient emergency room visit rate with Cigna Healthcare.  The Plan *should have* paid $3,450 to PVHMC for these emergency services.  Instead, again, it paid nothing.

22.    In an initial, May 30, 2024 EOB, the Plan requested information about the Patient's earlier accident, but did not make a final payment decision. The requested information was provided.  The Plan did not apparently request or review medical records relating to the care provided to the Patient.

23.    In a later EOB dated August 7, 2025, the Plan, via 90 Degree Benefits, denied the entire claim and assigned the entire amount, $3,450, to patient responsibility, while indicating "Patient not liable" because "THESE SERVICES ARE NOT COVERED UNDER YOUR PLAN."

**C. Plaintiff Exhausted Its Administrative Remedies**

24.    Plaintiff pursued all levels of appeal that were available for each claim, with one exception, as explained herein, when it became clear that pursuing a final level of appeal for the smaller claim would have been futile.

25.    For the larger claim, PVHMC filed a timely first level appeal of the Plan's denial on or around December 5, 2024.  For months, Defendants and their

6

COMPLAINT

claims administrator, 90 Degree Benefits, failed to respond to the appeal.  After repeated insistence by Plaintiff, the Plan, through 90 Degree Benefits, finally issued a letter denying the appeal on February 26, 2025.[2]

26.    In this letter, Stacy Carlo, "Claim Resolution Manger" [sic] for 90 Degree Benefits, reiterated on Defendants' behalf that "no payment will be made on this claim" because the Plan "does not cover a vehicle accident where it is determined that a participant was involved in an automobile accident while not wearing a seatbelt."  The denial letter failed to include the actual language of the Plan upon which Defendants relied, however.

27.    PVHMC filed a timely second level appeal.  That appeal, too, was denied in a letter from 90 Degree Benefits dated September 24, 2025.  Defendants and their administrators, including 90 Degree Benefits, declined to provide a copy of the operative Plan / SPD.  For the first time, however, the Plan's second denial letter recited the actual language of the Seatbelt Exclusion:

> **Vehicle Accident.** That are for treatment of any Injury where it is determined that a Participant was involved in a motorcycle Accident while not wearing a helmet or in an automobile Accident while not wearing a seatbelt (or car seat), even if the cause of the Illness or Injury is not related to the failure of the Participant to wear a helmet or seatbelt (or car seat). This Exclusion does not apply: (a) to Participants who were passengers on public transportation, ride for hire or livery services or (b) when a seatbelt or helmet is not required by law.

28.    John Russo, Compliance Attorney for 90 Degree Benefits, wrote in this September 24, 2025 denial letter that "[a]ccording to the police report, Mrs. Soto was not wearing her seat belt in the accident. After reviewing the claim, the claim was processed correctly according to the Plan Document. Therefore, no payment will be issued."

/ / /

---

[2] This denial was tardy under ERISA claims handling regulations, which require that a response to an appeal within 60 days "unless the plan administrator determines that special circumstances (such as the need to hold a hearing, if the plan's procedures provide for a hearing) require an extension of time."  29 C.F.R. § 2560.503-1(i). There is no indication in the administrative record that there were "special circumstances," or that the Plan or its administrators needed to hold some kind of hearing or even that the Plan attempted to justify an extension of time to respond.

COMPLAINT

29.    Thereafter, Plaintiff filed a timely first-level appeal of denial of payment on the Patient's subsequent May 9-10, 2025, emergency room visit.

30.    On November 20, 2025, Mr. Russo of 90 Degree Benefits issued a denial of this appeal as well.

31.    Tellingly, Mr. Russo's November 20, 2025 denial letter was a nearly word-for-word carbon copy of his earlier September 24, 2025 denial letter. This made abundantly clear that the Plan would not reconsider its position on the Seatbelt Exclusion.

32.    Rather than pursue further appeals, PVHMC staff sent a December 15, 2025, email to Mr. Russo and another of his colleagues at 90 Degree Benefits, informing them that PVHMC would not be filing a second level appeal on the smaller claim because doing so "would be pointless."  As of the filing of this Complaint, PVHMC received no response indicating that the Plan would be willing to reconsider its previous denials.

33.    Accordingly, Plaintiff has exhausted all its administrative remedies under ERISA, and/or further appeals would have been futile.

34.    Because Defendants failed to follow ERISA claims regulations – which require that plan administrators provide the "specific reason or reasons for [each] adverse determination" of benefits, and respond timely to appeal letters – all remaining levels of appeal, if any, have also been "deemed exhausted" within the meaning of 29 C.F.R. § 2650.503-1(l)(1).

**D. Because the Seatbelt Exclusion Was Not Sufficiently Disclosed in the Summary Plan Description, It is Not Enforceable Under ERISA**

35.    The Seatbelt Exclusion is unenforceable because it fails to comply with ERISA's statutory and regulatory disclosure requirements. *See* 29 U.S.C. § 1022(a); 29 C.F.R. § 2520.102-2(a).

36.    "ERISA's central policy goal is to protect benefit plan participants 'by requiring the disclosure and reporting to participants and beneficiaries of financial

8
COMPLAINT

and other information . . . and by providing for appropriate remedies, sanctions, and ready access to the Federal courts." *King v. Blue Cross & Blue Shield of Ill.*, 871 F.3d 730, 740 (9th Cir. 2017) (quoting *Scharff v. Raytheon Co. Short Term Disability Plan*, 581 F.3d 899, 904 (9th Cir. 2009)).  To further this goal, ERISA requires that benefit plans provide participants with an SPD and a "summary of any material modification in the terms of the plan." *Id*. (citing 29 U.S.C. § 1022(a).

37.     By statute, the SPD "*shall* be written *in a manner calculated to be understood by the average plan participant*, and shall be sufficiently accurate and comprehensive to *reasonably apprise* such participants and beneficiaries of their rights and obligations under the plan."  29 U.S.C. § 1022(a) (emphasis added).

38.     The implementing regulation for Section 1022(a) elaborates that:

> *[a]ny* description of *exception, limitations, reductions, and other restrictions of plan benefits* **shall not be minimized, rendered obscure or otherwise made to appear unimportant**. Such exceptions, limitations, reductions, or restrictions of plan benefits shall be described or summarized in a manner not less prominent than the style, captions, printing type, and prominence used to describe or summarize plan benefits. The advantages and disadvantages of the plan shall be presented without either exaggerating the benefits **or minimizing the limitations**. The description or summary of restrictive plan provisions need not be disclosed in the summary plan description **in close conjunction with** the description or summary of benefits, ***provided that*** adjacent to the benefit description the page on which the restrictions are described is noted.

29 C.F.R. § 2520.102-2(b) (emphasis added).

39.     The Ninth Circuit routinely holds that benefit limitations in ERISA-governed health benefit plans are unenforceable where they fail to comply with these mandatory disclosure requirements.  For example, in *Spinedex Physical Therapy USA Inc. v. United Healthcare of Ariz., Inc.*, 770 F.3d 1282, 1296 (9th Cir. 2014), the Ninth Circuit invalidated benefit limitations in two SPDs that "were not disclosed in compliance with" Section 2520.102-2(a).  Likewise, *King v. Blue Cross & Blue Shield of Illinois* refused to enforce a benefit limitation because it was not adequately disclosed in a summary of material modifications (SMM), which is a document akin to an SPD that summarizes changes to a plan. 871 F.3d at 742.

40.    Exclusions and limitations on benefits may be enforced **_only if_** the limitation is disclosed "in close conjunction with" the summary of the plan's benefits, **_or_** if there is a notation "adjacent to the benefit description" identifying the page later in the SPD where the limitation can be found.  29 C.F.R. § 2520.102-2(b).  If neither of these requirements is met, then the limitation on benefits *is void and without force and effect*.

41.    The rationale is simple: an ERISA benefits plan cannot "require a plan beneficiary to read every provision of an SPD in order to ensure that he or she did not miss a limitation provision."  *Spinedex*, 770 F.3d at 1296.

42.    The Plan at issue created a single document to serve both the SPD and the formal document governing the plan and.  (*See* Plan / SPD, Exhibit A.)

43.    In the Plan/SPD, the Seatbelt Exclusion is not "in close proximity" to this summary of benefits.  The amended summary of benefits, found at the beginning of the SPD, which has an effective date of January 1, 2021, states that "Emergency Room" is a covered benefit under "HOSPITAL/FACILITY CARE" at "$250 Copay after Deductible," with out-of-network benefits being "Same as In-Network."  (Exhibit A at p.10.)   Under the same heading, the benefit for "Room & Board- Semi-Private ICU & Other Special Units," a category which includes both intensive care unit (ICU) care and other kinds of specialized hospital inpatient care, is listed as being "80% after Deductible" for the in-network benefit and "50% after Deductible" for the out-of-network benefit.

44.    Despite this clear description of covered emergency room and hospital care benefits just 10 pages into the document, the Seatbelt Exclusion is not found until page 58 of 117 of the document – halfway through the Plan / SPD.  The Seatbelt Exclusion is not in close conjunction with the description of benefits.

45.    Moreover, there is also no notation in the amended summary of benefits *adjacent to* the description of emergency room and hospital / facility care benefits that identifies the page upon which the Seatbelt Exclusion may be found.

10
COMPLAINT

Page 10 of the Plan / SPD contains no notation identifying where the Seatbelt Exclusion, or any other exclusion, can be located.

46. The only way for a reasonable participant of the Plan to locate the Seatbelt Exclusion, then, would be to *read through every provision in the entire document*.

47. "Such a requirement," however – e.g., to require a participant to read the entire SPD – "is what the regulation is specifically designed to avoid." *Spinedex*, 770 F.3d at 1296. Notably, in *Spinedex*, a provision limiting benefits that was found in Section 9 of an SPD was held to be unenforceable even where the Ninth Circuit assumed, *arguendo*, that the preceding section, Section 8, was a benefits section. *Id*. Under ERISA, it is not reasonable to ask a reasonable plan participant to read the following section after the one at issue just to understand what their benefits were under the plan, and the limitations on those benefits.

48. Here, a reasonable participant in the Plan would have to read *half of the entire Plan / SPD document* just to learn that the Seatbelt Exclusion exists.

49. Because the Seatbelt Exclusion was not adequately disclosed, it is unenforceable. *Spinedex*, 770 F.3d at 1297 (giving healthcare provider, proceeding by assignment from plan beneficiary, the benefit of this disclosure rule).

**E. The Seatbelt Exclusion Violates Federal Law that Requires Coverage of Emergency Care**

50. Separately, the Seatbelt Exclusion is also unenforceable because the federal No Surprises Act (NSA) requires coverage of emergency care "*without regard to* any other term or condition of such coverage." 42 U.S.C. § 300ggg-111(a)(1)(D) (emphasis added). Though PVHMC rendered extensive emergency and trauma care to the Patient, as described herein, the Plan failed to cover such care, in violation of federal law.

51. The NSA imposes a clear statutory mandate: <u>if</u> a group health plan "provides or covers any benefits with respect to services in an emergency

11
COMPLAINT

department of a hospital," <u>then</u> the plan "**shall** cover emergency services (as defined in paragraph (3)(C))" <u>without imposing unnecessary terms or conditions</u>. *See* 42 U.S.C. § 300ggg-111(a)(1).

52.     Thus, for instance, group health plans cannot impose a "prior authorization" requirement upon emergency services. *Id.* § 300gg-111(a)(1)(A). This means that a group health plan cannot deny benefits for emergency services unless such services are approved in advance by the plan. Plans must also limit the out-of-network cost-sharing (where the patient has seen an out-of-network emergency provider), so it is not greater than the cost-sharing they would incur at an in-network emergency provider. *Id.* § 300gg-111(a)(1)(C).

53.     Crucially, here, the NSA further requires group health plans to cover hospital emergency services "*without regard to any other term or condition of such coverage* (other than exclusion or coordination of benefits, or an affiliation or waiting period, permitted under section 300gg-3 of this title, including as incorporated pursuant to section 1185d of Title 29 and section 9815 of Title 26, and other than applicable cost-sharing)." 42 U.S.C. § 300gg-111(a)(1)(D) (emphasis added).

54.     In rulemaking, the U.S. Department of Health and Human Services (HHS), the U.S. Department of Treasury, and the U.S. Department of Labor (the "Departments") have elaborated on the meaning of the phrase "without regard to any other term or condition of such coverage." The Departments explain that group health plans like the Plan <u>must cover emergency services</u> **_even if_** there is a "general plan exclusion" that would otherwise apply to deny coverage:

> <u>"The Departments are [] aware that some plans and issuers that generally provide coverage for emergency services **have nonetheless denied benefits for such services _based on other general plan exclusions._** For example, the Departments are aware of some plans and issuers denying claims for emergency services provided to dependent women who are pregnant, based on a general plan exclusion for dependent maternity care.</u>

As explained previously, both the coverage of emergency services rules issued under section 2719A of the PHS Act and the new emergency services requirements included in these interim final rules provide, in part, that if a plan or issuer provides or covers any benefits with respect to services in an emergency department of a hospital (or under these interim final rules, in an independent freestanding emergency department), emergency services must be provided "without regard to any other term or condition of the plan or coverage (other than the exclusion or coordination of benefits...)."

The Departments clarify that this provision does not permit plans and issuers *to exclude benefits* for items and services *that would otherwise constitute benefits for an emergency medical condition* as defined under these interim final rules. **This provision *does not permit*** plans and issuers that cover emergency services **to deny benefits** for a participant, beneficiary, or enrollee with an emergency medical condition that receives emergency services, **based on a general plan exclusion that would apply to items and services other than emergency services**."

Requirements Related to Surprise Billing; Part I, 86 Fed. Reg. 36872, 36880 (July 13, 2021), https://www.govinfo.gov/content/pkg/FR-2021-07-13/pdf/2021-14379.pdf (emphasis added).

55.    In short, "emergency services must be provided without regard to any other term or condition of the plan or health insurance coverage other than the exclusion or coordination of benefits, an affiliation or waiting period permitted under the Code, ERISA, and the PHS Act, or applicable cost-sharing requirements." *Id*., 86 Fed. Reg. at 36873; *accord* 45 C.F.R. 149.110(b)(5)(i)-(iii).

56.    The Plan here offered comprehensive coverage for emergency services in a hospital.  Thus, the NSA's emergency coverage mandate applies to the Plan.

57.    Next, the Seatbelt Exclusion is, by definition, a general plan exclusion that applies to items and services other than emergency services.  It applies to the "treatment of *any* injury where it is determined that a Participant was involved in a . . . Accident while not wearing a seatbelt (or car seat), even if the cause of the Illness or Injury is not related to the failure of the Participant to wear a . . . seatbelt

13
COMPLAINT

(or car seat)."  This exclusion applies to any healthcare items and services in connection with the treatment of any injury.  It is therefore a general plan exclusion of the kind described by the Departments, and must give way to the NSA's emergency coverage mandate.

58.    The Departments' simple and straightforward interpretation of the NSA's emergency mandate is not new.

59.    Even *before* the No Surprises Act took effect for plan years on or after January 1, 2022, the Affordable Care Act (ACA) imposed an *identical* mandate upon group health plans to cover emergency services "without regard to any other term or condition of such coverage."  *See* 42 U.S.C. § 300gg-19a(b) [Public Health Service Act Section 2719A].[3]

60.    Courts interpreting the earlier, identical emergency mandate under ACA have reached the same conclusion as the Departments do today with respect to the No Surprises Act. For instance, in *Henrikson v. Choice Products*, a federal district court considered an ERISA benefits claim brought by a beneficiary of a group health plan.  The beneficiary had suffered a hand injury due to the use of illegal fireworks.  The plan defendant denied the claim based on a general plan exclusion for illegal acts.  The illegal-acts exclusion notwithstanding, the district court held that the beneficiary had alleged a plausible claim for benefits in view of the ACA's requirement to cover emergency services "without regard to any other term or condition of such coverage."  *See Henrikson v. Choice Prods. United States, LLC*, No. 16-1317 (MJD/LIB), 2017 U.S. Dist. LEXIS 15668, at *2 (D. Minn. Feb. 2, 2017), *adopting and amending report and recommendation*, *Henrikson v. Choice Prods. USA, LLC*, 2016 U.S. Dist. LEXIS 183451, at *18 (D. Minn. Oct. 20, 2016).

---

[3] The No Surprises Act amended Section 300gg-19a to add new subsection (e) to that statute, which is a sunset provision that states, "The provisions of this section shall not apply with respect to a group health plan, health insurance issuers, or group or individual health insurance coverage with respect to plan years beginning on after January 1, 2022."

COMPLAINT

61.  During the administrative process, 90 Degree Benefits repeatedly denied PVHMC's appeals on the basis that the No Surprises Act somehow only applies to out-of-network claims, and "do[es] not apply to in-network denied claims." (*See* September 24, 2025 and November 20, 2025 letters from John Russo, Compliance Attorney (identical language in both letters).)

62.  Defendants had no credible basis for drawing this conclusion.  The NSA's emergency coverage mandate specifically instructs that emergency services, as defined, shall be covered <u>regardless</u> of "whether the health care provider furnishing [emergency] services is a participating . . . emergency facility . . . with respect to such services."  42 U.S.C. § 300gg-111(a)(1)(B).

63.  Last, the statutory exceptions set forth in Section 300gg-111(a)(1)(D) are not applicable.  The Plan did not deny coverage based on any rationale relating to the coordination of benefits under the Plan with benefits under any other coverage.  *See* 45 C.F.R. § 149.110(b)(5)(i) (limiting this exception only "to the extent not inconsistent with benefits for an emergency medical condition"). The Plan also did not deny coverage based on a permissible affiliation or waiting period under the Plan.  *Id*. § 149.110(b)(5)(ii).  Nor was there any cost-sharing for covered health care services here. *Id*. § 149.110(b)(5)(iii).

64.  For all these reasons, Defendants were wrong to deny all payment to PVHMC for the months of medically necessary emergency care that the Hospital rendered to the Patient.

## FIRST CAUSE OF ACTION

### (ERISA Section 502(a)(1)(B))

(Against All Defendants)

65.  Plaintiff incorporates all allegations set forth in the above paragraphs.

66.   Plaintiff has standing to pursue benefits under ERISA Section 502(a)(1)(B) pursuant to its assignment of ERISA plan benefits from the Patient.

/ / /

15

COMPLAINT

67.   On or around February 26, 2024, the first time that the Patient came to PVHMC, the Patient's sister executed a form titled, "Conditions of Admission to Pomona Valley Hospital Medical Center," on the Patient's behalf.

68.   That agreement included the following language:

7. Assignment Of All Rights And Benefits: I irrevocably assign and transfer to the hospital all rights, benefits and any other interests in connection with any insurance plan, health benefit plan, or other source of payment for my care, this assignment shall in lude assigning and authorizing direct payment to the hospital of all insurance and health plan benefits payable for this hospitalization or for these outpatient services. I agree that the insurer or plan's payment to the hospital pursuant to this authorization shall discharge the insurance company's obligations to the extent of such payment. I understand that I am financially responsible for charges not paid according to this assignment, to the extent permitted by state and federal law. I agree to cooperate with, and take all steps reasonably requested by, this hospital to perfect, confirm, or validate this assignment.

I also designate this hospital as my duly authorized representative to act on my behalf in connection with all matters arising from or relating to the services. I grant the hospital absolute power and authority to do anything that I would have been entitled to do in connection with the services, rights, or health plan, in any legal, private, public, administrative, formal or informal process or forum. This hospital shall act as my authorized representative in any internal or external appeal, review, or grievance process; in connection with any request for verification of coverage or request for authorization of services; in connection with any pre-service and post-service claim or appeal; and, if necessary, in litigation. . . . .

69.   Subsequently, on or around May 9, 2024, the Patient returned to the Hospital's emergency room. At this time, the Patient personally executed another "Conditions of Admission" form, containing the same language quoted above.

70.   Finally, on or around November, 13, 2025, the Patient executed a "Supplemental Assignment of Benefits" which ratified and affirmed the validity of the previous two assignments on February 26, 2024 and May 9, 2024, and in addition, included the following language:

To the extent not already assigned to PVHMC in connection with these COA forms executed by me and/or on my behalf, I hereby assign to PVHMC the following causes of action in connection with benefits under my health plan with respect to the medical services I received at PVHMC:

- The right to sue for benefits under my health care plan or for breach of any term of my health plan contract;
- The right to sue for equitable relief under ERISA Section 1132(a)(3), including but not limited to injunctive relief, declaratory relief,

16

COMPLAINT

surcharge, reformation, and for breach of fiduciary duty;
- The right to request plan documents and to sue for statutory penalties available under ERISA Section 1132(c).

71.     Taken together, this language was sufficient to assign the Patient's benefits for emergency and hospital care under the Plan.  This, in turn, conferred upon Plaintiff the right under ERISA to sue derivatively for benefits derivatively on Patient A's behalf.  *See Misic v. Building Service Employees Health and Welfare Trust*, 789 F.2d 1374 (9th Cir. 1986) (holding that a physician, "as assignee of beneficiaries pursuant to assignments valid under ERISA, has standing to assert the claims of his assignors" and could therefore sue under section 501(a)(1)(B)). *See also DB Healthcare, LLC v. Blue Cross Blue Shield of Ariz., Inc*., 852 F.3d 868, 877 n.7 (9th Cir. 2017) ("An assignment of the right to receive payment of benefits generally includes the limited right to sue for non-payment under § 502(a)(1)(B), which empowers a participant or beneficiary to bring a civil action "to recover benefits due to her under the terms of the plan.'")

72.     The Plan terms themselves explicitly permit assignments of benefits. At page 56, the Plan / SPD contains a heading, "Payment of Benefits," and a sub-heading, "Assignments," that defines "the term 'Assignment of Benefits' consistent with the concept above.  The Plan expressly provides that "If a Provider accepts said arrangement [e.g., an Assignment of Benefits], the Provider's rights to receive Plan benefits are equal to those of the Participant, and are limited by the terms of this Plan Document. Provider that accepts this arrangement indicates acceptance of an AOB and Deductibles, Copayments, and Coinsurance amounts, as consideration in full for treatment rendered."

73.     The Plan's provisions in this regard are entirely consistent with black letter law that an "assignee stands in the shoes of the assignor, and, if the assignment is valid, has standing to assert whatever rights the assignor possessed." *Misic*, *supra*, 789 F.2d at 1378 n.4.

/ / /

74.     Elsewhere, the Plan / SPD notes, under the definition of "Network" or "In-Network" (page 34 / 117) by stating that a "Network's Providers have agreed to accept assignment of benefits and the discounted fees thereby paid to them by the Plan as payment in full for Covered Expenses."  As explained, PVHMC was a network provider with respect to the Plan because it participated in the Cigna Healthcare network.  In such a situation, the Plan / SPD permits and acknowledges assignments of benefits to a provider.

75.     Accordingly, Plaintiff proceeds pursuant to its assignment of benefits from the Patient and seeks benefits under the Plan.  In doing so, Plaintiff was not required to waive any rights whatsoever, such as the right to contest a payment determination or the right to balance bill Patient.  Plaintiff never waived any of its rights under ERISA or any of its rights under the Conditions of Admission executed by the Patient as a condition of receiving services from Plaintiff.

76.     To the extent Defendants seek to argue that the assignment of benefits obtained by the Hospital were somehow not valid, they have waived and/or are estopped from raising such arguments.  *See Beverly Oaks Physicians Surgical Ctr., Ltd. Liab. Co. v. Blue Cross & Blue Shield of Ill.*, 983 F.3d 435, 442 (9th Cir. 2020).

77.     Every Form UB-04 billing form submitted by Plaintiff to the Plan indicated in the appropriate box that Plaintiff had obtained an assignment of benefits from the patient and was proceeding thereupon.  Specifically, Box 53, "ASG BEN," was checked on UB-04 billing form.

78.     Consistent with the language of the Plan, Defendants accepted the Plaintiff's assignment of benefits.  At no time did during the administrative claim process did Defendants raise the anti-assignment provision as a basis to deny benefits.  Defendants permitted Plaintiff to pursue every level of appeal available to Plaintiff, as a beneficiary in the Plan, pursuant to Plaintiff's assignment of benefits.  At no time during the extensive appeal process did Defendants or their representatives inform Plaintiff that its assignment of benefits was invalid.

18
COMPLAINT

79.     The Hospital also communicated with representatives of the Plan, including 90 Degree Benefits and Cigna Healthcare, to confirm it was eligible to receive payment as an in-network provider.  For instance, and without limitation, on or around February 26, 2024, 90 Degree Benefits, on behalf of the Plan, sent a fax to Plaintiff containing detailed information about the Patient's coverage under the Plan, including a multiple page document termed, "Summary of Benefits and Coverage."  Nowhere in this fax communication did 90 Degree Benefits inform PVHMC of the existence of anti-assignment clause. (Nor, for that matter, did it inform PVHMC about the existence of the Seatbelt Exclusion.)

80.     The Plan, through its utilization management consultants, likewise approved the entire initial 68-day stay from February 26, 2024, through May 4, 2024. Representatives of the Plan were in regular communication with the Hospital through the Patient's entire hospital stay. Had Defendants indicated that the Hospital would not be paid for any of the care rendered during that period to the very sick Patient, the Hospital would have had an opportunity to have the Patient transferred at the earliest possible opportunity to a different provider.

81.     Plaintiff diligently pursued all internal appeals available under the Plan and exhausted all appeal remedies.  Defendants denied each of the appeals submitted by Plaintiff, as described above.  All appeals have either been exhausted, or are deemed exhausted, or would have been futile, as explained wherein.

82.     Despite providing months of life-saving, critical care rendered to the Patient, Defendants failed to pay a single cent in benefits to the Hospital. Defendants apparently believe that the Patient should be solely responsible for her own care in addition to the extensive pain and suffering that the Patient endured.

83.     As set forth above, the Plan provides full coverage for the trauma, emergency and inpatient services rendered to the Patient.

84.     Moreover, as set forth above, the Seatbelt Exclusion is not enforceable because it was not adequately disclosed pursuant to 29 U.S.C. § 1022(a) and 29

COMPLAINT

C.F.R. § 2520.102-2(b).  The Seatbelt Exclusion, despite being an absolute limitation on benefits, was not located "in close conjunction with" the benefits provisions of the SPD, for all the reasons explained above. Nor did any description of emergency and hospital inpatient benefits under the SPD include a notation on which the Seatbelt Exclusion could be found.  A reasonable Plan participant would not be alerted to the existence of the Seatbelt Exclusion unless the participant read through the entire SPD – precisely what ERISA's disclosure rules were designed to avoid.

85.    Plaintiff is therefore entitled to benefits from the Plan in the amount of $1,339,217.66 for the initial trauma and emergency response service and 68-day stay; and $3,450 for the subsequent emergency room visit, for a total of $1,342,718.90, exclusive of interest at the federal interbank rate.

86.    Plaintiff is also entitled to its reasonable attorneys' fees under ERISA Section 502(g).

## SECOND CAUSE OF ACTION

### (The No Surprises Act, 42 U.S.C. § 300gg-111(a), via ERISA Section 502(a)(1)(B))

(Against All Defendants)

87.    Plaintiff incorporates all allegations set forth in the above paragraphs.

88.    Plaintiff proceeds on this cause of action under ERISA pursuant to its valid assignment of benefits from the Patient, as alleged above.

89.    Page 69 The SPD / Plan contains a provision titled "Conformity with Applicable Laws," which states as follows:

> Any provision of this Plan that is contrary to any applicable law, equitable principle, regulation or court order (if such a court is of competent jurisdiction) will be interpreted to comply with said law, or, if it cannot be so interpreted, **shall be automatically amended to satisfy the law's minimum requirement**, including, but not limited to, stated maximums, Exclusions, or statutes of limitations. **It is intended that the Plan will conform to the requirements of ERISA**, as it applies to Employee welfare plans, **as well as any other applicable law.**

90.     Section 502(a)(1)(B) permits Plaintiff, via its assignment of benefits from Patient A, "to recover benefits due [] under the terms of [Patient A's] plan, to enforce [Patient A's] rights under the terms of the plan, [and/]or to clarify [Patient A's] rights to future benefits under the terms of the plan."

91.     The Seatbelt Exclusion is in direct violation of the NSA's emergency coverage mandate.  As set forth above, the NSA's statutory mandate requires that the Plan cover emergency services, as defined under the NSA, "without regard to any other term or condition of such coverage . . . ." 42 U.S.C. § 300gg-111(a)(1)(D).

92.     None of the statutory exceptions set forth in the NSA's emergency coverage mandate apply here.  The only reason it denied coverage was based on the Seatbelt Exclusion, which constitutes a general plan exclusion as contemplated in the Departments' guidance above.

93.     Accordingly, the Plan must pay  for all emergency medical services that the Hospital provided to the Patient, including trauma services following the car accident, general emergency room services, and hospital care rendered in the Intensive Care Unit, in an amount to be determined at trial.

94.     Plaintiff is further entitled to interest at the federal interbank rate, and its reasonable attorneys' fees under ERISA Section 502(g).

**WHEREFORE,** Plaintiff prays:

A.     On the First Cause of Action, for an order obligating Defendants to pay ERISA benefits the amount of $1,342,718.90 or alternatively, an amount to be proved at trial;

B.     On the Second Cause of Action, for an order obligating Defendants to pay ERISA benefits in an amount to be proved at trial;

C.     For an award of costs, including attorneys' fees to the full extent permitted under the law, including without limitation, pursuant to ERISA, and any other applicable law;

D.    For an award of pre- and post-judgment interest to the full extent permitted under law;

E.    An award of such other relief as the Court deems just and proper.

Dated:  January 15, 2026                    ATHENE LAW, LLP

By:    _____/s/ Eric D. Chan_____
                    ERIC D. CHAN
Attorneys for Plaintiff POMONA VALLEY
HOSPITAL MEDICAL CENTER

COMPLAINT